Good morning. May it please the Court, Beth Andrus here on behalf of the defendant, Oscar Delgado. I have intended to reserve five minutes of my time for rebuttal if the panel so allows. If not, I'll certainly go with the Court's wishes. We are here today to ask this Court to reverse Mr. Delgado's convictions for conspiracy and possession of money. We have a few minutes left. I'd like to address two issues this morning, the first being the instructional error in the giving of the broad general definition of knowingly in Instruction No. 9, which we contend conflicts with the knowledge elements necessary for conspiracy and possession. And also the district court's failure to articulate its reasons for imposing a sentence at the high end of a sentencing range that exceeded 24 months. Let me start with the plain error in instructing the jury on the, that the government was not required to prove that Mr. Delgado knew that his actions were unlawful. The question that I think this case presents is if the government charges a defendant with possession of prohibited drugs, that was the term used in Instruction 14, and conspiracy to possess and distribute these prohibited drugs, must the government prove that he knew that his actions were illegal? And we believe that the answer to those questions is yes. What is the legal authority for your conclusion? I think that we start from a deconstruction of the statutory language. That's essentially what occurred in the Santillan and the Turman cases, which are cited in the comment to the Ninth Circuit jury instruction on the ignorance of the law instruction. In Santillan and Turman, this Court held that you should not use this instructional language if knowledge of the illegal activity is an element of the crime. Now, what knowledge are we talking about? Because if we, first of all, this went to a jury. Correct. And so we have to deal kind of with the facts that the jury found, right? Yes. And it seems to be that there was some contradictory facts, both from the defendant, his accomplice, and the confidential informant. But it seems to be the jury felt that Mr. Delgado had participated with his co-defendant in distributing drugs, if you will, selling them to the confidential informant. And in fact, the confidential informant said, gosh, we met on a logging road, and he said to go do it. So if that's the case, he doesn't have to know that it was meth, according to the laws, I understand it, right? Well, but he has to know it was a prohibited drug. Well, in other words, he was doing all these clandestine things because they were playing with gummy bears, right? Well. The jury found not so. Well, not necessarily true, because if you would look at the jury instructions, the government gave a Pinkerton instruction. So he they could have found his possession was vicarious merely through being a co-conspirator with Vasquez Santiago. So they could have. But the recorded transactions that were introduced in the discussions that were testified to, the jury had to find that he knew he was dealing in contraband. But none of those taped recordings involved Oscar Delgado. All of those tape recordings were between Vasquez Santiago and the confidential informant. My client's name never came up in the context of those recorded conversations. Now, the jury could have easily found that at a time when he was completely innocent of what was going on until he got to the driveway, and then, well, you know, maybe he should have known that there was something suspicious in that package that he carried into the garage. If the logging road evidence came in, he's on a remote logging road. He meets with these people. He tells his co-defendant to go find he knows where it is. Again, are they hiding gummy bears? What is this? Well, no, but the jury did not necessarily. We have no indication that the jury necessarily credited Jeffrey Shower's testimony to that effect. They could have found him guilty. They could support that finding, and that's what we look for, don't we? Well, that's certainly the. What we think we should support the finding with. No. The standard is fairly well set. Fairly well satisfied for the government, as long as they presented evidence that will support the verdict. But then you go back to the jury instructions. If the jury was instructed erroneously as to what the knowledge element was, then they could have found that they could have discredited the statements of Jeffrey Showers and said, well, it was really not Oscar Delgado who was out there on the logging road on those previous occasions. As Vasquez Santiago testified, he said it was actually his supplier. I don't see. I also don't see how the facts will help you there, because with the verdict in the government's favor, we have to look at the facts in favor of that verdict. I see your problem theoretically, that 9 and 10 could be read to be inconsistent, but I don't see how that helps you on the facts here, because under instruction 10, the jury was properly instructed on the elements of conspiracy and that he had to be planning and knowing that he was doing something unlawful. And it's potentially confusing that number 9 says no, but they can be harmonized in the following way, it seems to me. It's not very plausible, but someone could say, well, yes, I'm dealing methamphetamine, but I think that in this State it's legal to do that, and that wouldn't help the person. That's what instruction number 9 says. But that wouldn't make him not guilty of conspiracy under number 10 either. Well, except if you take a look at the definition of conspiracy in the case now. A conspiracy is an agreement to accomplish an illegal objective. Yes. In fact, it is illegal to deal drugs, and he could have believed that it was okay and he'd still be guilty. That's what number 9 says. But he still, under both of those instructions, has to be actually agreeing to participate in the conspiracy to sell methamphetamine. And he has to know that what he's agreeing to do is illegal conduct. But then you go back to number 9, and number 9 is saying, but no, they don't have to prove that he knew that he was engaging in illegal conduct. So we do, in fact, have a conflict between what they've been instructed in the conspiracy charge and what they've been instructed in number 9. So they could have said, well, whether he knew or not knew, he should have known. We don't know that. That's how we raise the due process problems is because we simply don't know. They were instructed improperly as to what the appropriate knowledge element was. Now, we can say, well, they may have adopted everything that Jeffrey Showers says and rejected. They should have had to to find him guilty of any of the crimes here. They had to dismiss your client. No. That's not necessarily true because the government argued at trial and in closing that at least at a minimum he knew at the time he got back into the vehicle when Vasquez Santiago picked him up from the store in Olympia and they decided to drive together to Bremerton. He should have known at that point because the drugs stink. And he should have been able to smell it. And so they were arguing in the alternative that he may not have known when Vasquez Santiago took his truck up onto the logging road to get the packet, but he should have known because they spent so long of a time driving from wherever they were on the peninsula over to Bremerton. I can't disregard, if we're going to go with the evidence, the fact that the testimony was he instructed the co-defendant, your client, to go get it. So he knew where it was and knew what it was. Well, the testimony was, and Showers can't contradict this, the testimony was that what Vasquez Santiago said, you're talking about the day in question, the day of the arrest. Logging road. No. On the logging road, Showers, there were two logging road episodes. Showers testified that in the past, on one prior occasion, he had ridden with Oscar Delgado and Vasquez Santiago up a logging road that Oscar was driving and at that point Oscar turned to Vasquez Santiago and said, you know where it is. That was Showers' testimony about one logging road incident. There was the second incident was on the day of the arrest when Vasquez Santiago said he dropped Delgado off at the shopping mall. He then drove up to the logging road, met his supplier, who he claims was the one who was really with him on the previous occasion, got it, and then when they drove to Showers' home, he got out of the vehicle and then told Oscar, take off these screws, find this packet, this Walmart bag that I put in the car. Let me briefly touch on the sentencing arguments so I can reserve some time for rebuttal. We are also alternatively asking that the court reverse vacate the sentence based on noncompliance with Section 3553. We have no statement of reasons in the record for why a 188-month sentence was imposed for Mr. Delgado when Vasquez Santiago received a sentence of 168 months. This is de novo review. There is no consideration of Mr. Delgado's background, character, conduct, nothing like that in the record. At sentencing, it was in fact contested quite clearly as to what the extent of Delgado's role was, not only in this transaction but in prior transactions. And he sought sentencing at the lower end based on his lack of criminal history, which was in direct contrast to Vasquez Santiago, who had three prior drug convictions. And there was no evidence at all that Delgado was a major drug player. Yet we have no statement in the record to explain why Judge Tanner sentenced him at the top of the range. There is some intimation from the government that it was because he did play a leadership role. But if that was the case, we don't have a finding by Judge Tanner to that effect, and that violates Rule 32. And under this Court's prior law, that requires a vacation of the sentence and a complete new resentencing hearing. Thank you. We'll hear from the government. Good morning. May it please the Court. My name is John Legend, and I represent the United States. The defendant has hit it on the head about the jury instruction, but she misses one point, and that's the case of the United States v. Cain, which is cited in the government's brief. That case recognizes the situation in which the instruction number 9 in this case, the general knowledge with that specific language the defense takes offense to, is put in the context of a drug crime. But that was not a conspiracy. No, it wasn't. It wasn't. It was a possession case. And I do recognize the difference between the two. But in that case, the Court was still able to harmonize the two. And in this case, we would assert that that would still override and control the matter. So your position is if the person knows that there's a conspiracy to deal drugs, all they have to do is consciously agree to deal drugs and don't necessarily have to know what the penalties are that are attached to that, or what is that your? What they need to do is join into an agreement, as the conspiracy elements say, an agreement to commit one of the acts set forth in the indictment in this case to distribute drugs. And it doesn't matter what they do, whether they're going to sell it, whether they're going to take a role in driving around, whether they're going to retrieve it and take it into the person. But the question is whether they have to know that dealing drugs is illegal for them to be guilty of the conspiracy count. What that would do is change, I think, the men's ray from knowledge to willfulness. And I think what the defense is trying to do in this sense is turn it from this men's ray into a men's ray that would be sort of a cheek analysis set forth by the Supreme Court, whereas ignorance of the law would be a defense. So your position is that to be guilty of the conspiracy, there has to be an agreement, and there has to be an agreement in this case to possess the drugs in question. And I think that I forget now whether the indictment said to distribute. Yes. The intent to distribute. The intent to distribute. But the government does not have to prove that in a subjective sense the defendant knew that it was illegal to distribute or to possess with intent to distribute. No. He's involved in this scheme to carry out the act of distributing drugs. Is that an extension of Cain, the conspiracy? I would argue that Cain would follow through with that because the underlying crime would be the same, possession with the intent to distribute. Regardless of this, I mean, we are getting into a very academic area. I think Your Honor hit it on the point a few minutes ago. There is so much overwhelming evidence in this case that even without that instruction, the jury certainly would have come to the same result. And no one objected to the instruction, so we're reviewing under plain error. Is that correct? Absolutely, Your Honor. And because it's a plain error review, the ultimate, and the defendant talks about this, the Court has some discretion if there is a severely affected fairness, integrity, the public perception of the judicial proceedings. But the problem is that decision is made on consideration of all the circumstances, including the strength of the evidence against the defense. And in this case, the evidence is overwhelming. The defendant knew exactly what was going on. The defendant talked about that the jury could have possibly disregarded Showers, but she misses something in there, that in the closing argument of the defense, the defense said members of the jury, somebody to this extent, members of the jury, the decision for you to make is which drug dealer to believe, Jeffrey Showers or Vasquez-Santiago. In this case, the jury returned a verdict for the government, which would suggest that they did believe Mr. Showers. Now, if you look at the evidence that Mr. Showers presented, it doesn't stand alone. It's not just his words. It's corroborated by what the officer saw. It's corroborated by what Mr. Vasquez-Santiago said. One instance that jumps out is what Your Honor was talking about, the incident on the logging road. Mr. Vasquez-Santiago stated that at no point did he ever tell Mr. Showers that he ever purchased drugs from somebody along this logging road. In fact, he said, I've never even taken them out there. He'd have no reason to know that. Well, why doesn't he know then? Very specifically, they drove out to Olympia. They went to this logging road. It seems to match the description of what Mr. Vasquez-Santiago said where the drugs were located that Mr. Delgado took them to. Your Honor, I believe that the evidence is so strong in this case would certainly cover that, even if there was some slight error in this. It's overwhelming. Unless the Court has any other questions. Go ahead. On the sentencing issue, as the record stands now, is there anything in the record that explains Judge Tanner's sentencing decision? Yes, Your Honor. The sentencing decision was based on really two points that were set forth in the recommendation. One is the defendant had a managerial responsibility based on what the Court saw at trial. The evidence is there, specifically what His Honor talked about, him instructing, the defendant instructing Mr. Vasquez-Santiago, go get the drugs. Mr. Showers also testified that at certain points during breaks in the negotiations, Mr. Vasquez-Santiago would turn to Delgado and confer with him as if to almost seek approval for what was going on. So that would be certainly a consistent finding with the facts that were presented at trial. In addition, Your Honor, the Court noted that two times Mr. Delgado had been deported. Now, it may not be. I didn't hear that. I'm sorry. He had been deported on two occasions and returned to the United States. And I believe that he mentioned that he was here illegally at the time that he engaged in this drug transaction. The only – I – that was my question. The only thing I found was Part E of the presentence report, factors that may warrant an upward departure, where the probation report negates leadership role but says, nevertheless, he might have exercised management responsibilities over the criminal operation. Therefore, an upward departure may be warranted. Now, where did Judge Tanner reference that? Judge Tanner never referenced anything warrantly. The only thing he did – How does that reconcile with what is required? I thought he had specifically have to say. He made quite a – he took the top end, I think it was 188 months. That's correct. He's got to explain that somewhere. And he didn't say anything. He didn't do it orally on the record. But the case law suggests that it can be done in writing. And by referencing back to the presentence report – What did he do in writing? What he did in writing was checked off on the box that – I believe this was at – Tell me – I thought I looked for that, too. Where is it? I think it's at page 340 – excuse me – 344 of the supplemental excerpts of the record. Okay. I don't seem to have that. I'll look it up. It's in the second box. The box that he checked off. It says the court adopts the sentencing recommendations in the presentence report and it essentially adopts the relevant factual findings insofar as necessary to support these recommendations. That's pretty general. That's a good catch-all. It is pretty catch-all. But it's catch-all only if you don't read it in the context of the PSR. In the case that you can check off something like that and that's sufficient to satisfy the rules? I haven't seen one, Your Honor. Unless the Court has any further questions, I'll submit on our filings. Thank you. That's the time left for rebuttal. Yes. Thank you, Your Honor. The form that counsel just referred to, Your Honor, was actually stricken from the record based on a motion to strike that I had filed, and I have the order granting the motion to strike. The reason it was stricken was because it doesn't appear in the district court's record. So even if this form was in fact a part of the district court's record, it's been stricken. It can't be a basis for the district court's ruling. Plus, this Court's already found in U.S. v. Wilson that circling that kind of identical language on a boilerplate sentencing form is not in fact individual consideration that is required under Section 3553. So even if this form were properly before this panel, it is improperly a basis on which to rely to affirm Mr. Delgado's sentence. There is no court finding at all contrary to counsel's statement that the court found that Mr. Delgado played a managerial role or had any managerial responsibility over the other participant. And in fact, there seems to be concession by both the probation office and the government that in fact he did not play or there was not sufficient evidence that he played any kind of a leadership role. So certainly, we can't speculate as to what Judge Tanner was basing the sentence on, but given the concession by the government, it certainly wasn't that Mr. Delgado was a leader here. He also referenced the fact that the court found that Mr. Delgado had been deported two times. That was actually merely a statement made by the probation officer. That was not anything that Judge Tanner ever found as a basis for sentencing Mr. Delgado at the top of the range. And I would also point out Mr. Vasquez-Santiago had been deported some nine times. So that also seems somewhat contradictory as far as basis for consistency in sentencing. Kennedy, what Mr. Vasquez-Santiago's sentence was? 168 for the identical charges, conspiracy and possession with intent to distribute. So unless the Court has any further questions, I'll submit the matter. Thank you, counsel. The case just argued is submitted. And we will move next.
judges: Brunetti, T.G. Nelson, Graber